IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NORTH CAROLINA
SOUTHERN DIVISION
NO. 7:13-CV-00192-BR

DAVID RHODES and DARLENE
HOLLAND,

        Plaintiffs,

    v.

JOHN INGRAM, in his official capacity as
Sheriff of Brunswick County, TIMOTHY
CLEMMONS, TINA EDWARDS, and
WESTERN SURETY COMPANY,

        Defendants.

                                ORDER

TIMOTHY CLEMMONS,

        Counterclaim Plaintiff,

    v.

DAVID RHODES,

        Counterclaim Defendant.

This matter is before the court on defendants John Ingram, in his official capacity as

Sheriff of Brunswick County, Timothy Clemmons, Tina Edwards, and Western Surety

Company's (collectively "defendants") motion for summary judgment, (DE # 53), and

counterclaimant Clemmons's motion for summary judgment, (DE # 56). These motions have

been fully briefed and are ripe for disposition.

## I. BACKGROUND

Plaintiffs David Rhodes and Darlene Holland (collectively "plaintiffs") filed this lawsuit

on 6 August 2013 in Brunswick County Superior Court, North Carolina. (DE # 1-2.) Plaintiffs

assert claims pursuant to 42 U.S.C. § 1983, (id. ¶ 84), as well as state law claims of false

imprisonment, (id. ¶¶ 91-97), intentional infliction of emotional distress, (id. ¶¶ 98-104), and

negligent infliction of emotional distress, (id. ¶¶ 105-113). Clemmons filed a counterclaim

against Rhodes alleging defamation. (DE # 11, at 18.) Defendants removed the case to this

court on 4 September 2013. (DE # 1-1.)

The undisputed, pertinent facts follow. Shortly prior to 12 February 2013, the Brunswick

County Sheriff's Office and other nearby law enforcement agencies were investigating several

reports of property stolen from a business and homes in the area. In particular, defendant

Detective Tina Edwards with the Brunswick County Sheriff's Office received information that

led her to believe that Timothy Vernon, Travis Priest, and Heather King may have been involved

in two of the thefts. (See Edwards Aff., DE # 54-5, ¶¶ 5, 7, 10.) Based on this belief, Detective

Edwards asked detectives with a local law enforcement task force to contact her if they

encountered any of the three individuals. (Id. ¶ 10.) Shortly thereafter, a detective on the task

force with the Shallotte Police Department notified Detective Edwards that King had been

talking with the detective about her involvement in a property theft ring. (Id. ¶ 11.) Detective

Edwards was informed that King told a police captain that she, Vernon, and Priest had disposed

of some of the property they had stolen. (Id.) King rode with the captain past a residence where

she stated the three of them had sold the stolen property. (Id.) The captain determined the

address for this residence was 1584 Holden Beach Road. (Id.)

On 12 February 2013, Detective Edwards interviewed King. (Id. ¶ 12.) King stated she

was waiting in a vehicle while Vernon broke into a home and stole a television. (Id.) They took

the television to a residence in Shallotte (which officers later confirmed to be 1584 Holden

Beach Road) where Vernon sold the television along with an air compressor and/or a generator

stolen from his employer to a man at the residence named "Dave" for $340.  (Id.)  According to

King, Vernon also gave or sold "Dave" a shotgun.  (Id.)  King further stated that she sold to

"Dave" for cash Walmart gift cards she had illegally obtained through shoplifting merchandise.

(Id.)  King told Detective Edwards that she had seen several other televisions at 1584 Holden

Beach Road.  (Id.)    Believing the information she had established probable cause to believe

that there was stolen property at 1584 Holden Beach Road, on the evening of 12 February 2013,

Detective Edwards with the assistance of two other officers drafted an application for a search

warrant of the premises.  (Id. ¶ 14.)  Later that same evening, Chief Resident Superior Court

Judge Ola Lewis issued the search warrant.  (Id. & Ex. A.)  The warrant authorized the seizure of

a number of items, including power and lawn equipment, electronics including computers,

firearms, property described on attached incident reports related to thefts the local task force was

investigating, and "any other property discovered that is stolen property or evidence of a crime."

(Id., Ex. A.)

        Still later that same evening, law enforcement officers executed the search warrant.

Believing "that there was at least one stolen firearm in possession of the subject(s) at 1584

Holden Beach Road, and a high potential for more, [Detective Edwards and other officers

involved] were concerned that there was a significant risk to the safety of the law enforcement

officers executing the search warrant."  (Id. ¶ 15.)  Accordingly, Detective Edwards's supervisor

requested the Brunswick County Sheriff's SWAT team to lead the execution of the search

warrant.  (Id.)

        Prior to executing the search warrant, the SWAT team met and was briefed "that stolen

firearms were believed to be present at 1584 Holden Beach Road and that the subjects at the

location, who were suspected of buying and possessing stolen high-dollar property, could

otherwise be armed and dangerous." (Holman Aff., DE # 54-7, ¶ 4; Cherry Aff., DE # 54-8, ¶ 4;

Lentz Aff., DE # 54-9, ¶ 4.) The SWAT team entered the house at 1584 Holden Beach Road by

use of a hand-held battering ram. (Holman Aff., DE # 54-7, ¶ 7; Cherry Aff., DE # 54-8, ¶ 9;

Lentz Aff., DE # 54-9, ¶ 8.) Upon determining no danger existed inside the residence, the

SWAT team radioed the detectives waiting outside in their vehicles to advise them the scene was

clear. (Lentz Aff., DE # 54-9, ¶ 13; see also Cherry Aff., DE # 54-8, ¶ 16.) After a short

debriefing outside, the SWAT team left. (Cherry Aff., DE # 54-8, ¶ 17; Lentz Aff., DE # 54-9, ¶

14.)

     After receiving the "all clear" radio call from the SWAT team, Detective Edwards, who

had been waiting outside in her vehicle, entered the house and found Rhodes seated on a couch

across from the front door with his hands bound by zip-tie cuffs. (Edwards Aff., DE # 54-5, ¶¶

16, 17.) Although Holland owned the residence, Rhodes stayed there occasionally, and, on this

evening, he was staying there to take care of Holland's dogs while she was out of town. (Rhodes

Dep., DE # 54-11, at 41; Holland Dep., DE # 54-14, at 11.)[1] Detective Edwards advised Rhodes

of his Miranda rights, and he agreed to speak with officers. (Edwards Aff., DE # 54-5, ¶ 17.)

Detective Edwards and another detective questioned Rhodes, and the search of the premises took

place. (Id.) Forty-nine items were identified as having been seized during the search, including

a sawed-off shotgun and other firearms, two diamond rings, Walmart gift cards, computers and

other electronics, a generator, and an EBT card in King's name in Rhodes's wallet. (Id. & Ex.

N.)

     Before the search of Holland's residence concluded, Detective Edwards and another

detective escorted Rhodes to his residence at 1241 David L Street. (Id. ¶ 22; see also Rhodes

Dep., DE # 54-12, at 46-47.) The detectives searched his property and seized several items,

---

[1] Page citations are to those generated by cm/ecf.

including items that Rhodes said he had bought from Priest—an air compressor, a transit, and two compound miter saws—as well as a nail gun and a shotgun. (Edwards Aff., DE # 54-5, ¶ 22 & Ex. E; see also Rhodes Dep., DE # 54-12, at 46-48.) After Rhodes informed officers that he needed an insulin shot, he was returned to Holland's residence where the medicine was located. (Edwards Aff., DE # 54-5, ¶ 24; Rhodes Dep., DE # 54-12, at 50-51.) The search of Holland's residence concluded around 1:00 a.m. on 13 February 2013. (See Rhodes Dep., DE # 54-12, at 52, 54.) Rhodes was not charged with any crime. (See Edwards Aff., DE # 54-5, ¶ 31.)

In the meantime, at some point during the evening, Holland spoke on the telephone with a male who identified himself as a member of the Brunswick County Sheriff's Department, who told her to bring back a television she had in her possession or else he would hold her dogs hostage. (Holland Dep., DE # 54-14, at 91-92.) Holland returned from out of town, went directly to the Shallotte Police Department, and turned over a 60-inch television, which she admitted to Edwards she had purchased from Priest, King, and Vernon. (Edwards Aff., DE # 54-5, ¶ 28; Holland Dep., DE # 54-14, at 97, 99.) She then returned to her home. (Holland Dep., DE # 54-14, at 100-102.)

## II. DISCUSSION

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In determining whether a genuine issue of material fact exists, the court must view all the facts and inferences therefrom in the light most favorable to the non-movant. Glynn v. EDO Corp., 710 F.3d 209, 213 (4th Cir. 2013). The court considers the claims in turn.

### A. Section 1983 Claims

Plaintiffs characterize their claims under 42 U.S.C. § 1983 as follows:

The first is Plaintiff Rhodes' claim for a violation of his Fourth Amendment right to be free from the government's use of excessive and unnecessary force in the context of a seizure. The second is a claim asserted by both Plaintiffs for violations of their Fourth Amendment right to be free from unlawful searches and seizures.

(Pls.' Mem., DE # 61, at 15.) Defendants contend that qualified immunity applies to these claims.

> In determining whether an officer is entitled to summary judgment on the basis of qualified immunity, courts engage in a two-pronged inquiry. The first asks whether the facts, viewed in the light most favorable to the plaintiff, show that the officer's conduct violated a federal right. . . .
> The second prong of the qualified-immunity inquiry asks whether the right was clearly established at the time the violation occurred such that a reasonable person would have known that his conduct was unconstitutional.

Smith v. Ray, 781 F.3d 95, 100 (4th Cir. 2015) (footnote and citations omitted). In analyzing the second prong, a case directly on point is not required "in order to conclude that the law was clearly established so long as 'existing precedent [has] placed the statutory or constitutional question beyond debate.'" Id. (citation omitted) (alteration in original). In the exercise of its discretion, the court decides which of these two prongs to address first in light of the circumstances of the case. Pearson v. Callahan, 555 U.S. 223, 236 (2009). A defendant is entitled to summary judgment on qualified immunity grounds if the answer to either prong is "no." See, e.g., Miller v. Prince George's Cty., Md., 475 F.3d 621, 627 (4th Cir. 2007).

*i. Rhodes's Excessive Force Claim*

As the Fourth Circuit Court of Appeals had recognized:

> A claim that a police officer employed excessive force is analyzed under the Fourth Amendment under an "objective reasonableness" standard. The officer's actions do not amount to excessive force if they "are 'objectively reasonable' in light of the facts and circumstances confronting [him], without regard to [his] underlying intent or motivation." In considering the reasonableness of an officer's actions, we

6

must consider the facts at the moment that the challenged force was employed.

> Evaluating the reasonableness of the officer's actions "requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." To properly consider the reasonableness of the force employed we must "view it in full context, with an eye toward the proportionality of the force in light of all the circumstances. Artificial divisions in the sequence of events do not aid a court's evaluation of objective reasonableness." We also must give "careful attention to the facts and circumstances of each particular case, including" three factors in particular: "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." Ultimately, the question to be decided is "whether the totality of the circumstances justifie[s] a particular sort of . . . seizure."

Smith, 781 F.3d at 100-101 (citations omitted) (alteration and omission in original).

According to Rhodes, on the evening of 12 February 2013, he fell asleep on the couch in the front room of Holland's residence. (Rhodes Dep., DE # 54-12, at 9, 24 & Ex. 3.) He was awakened by two loud booms. (Id. at 9, 12.) He got up and went to look out the kitchen window (facing out the front of the house). (Id. at 9, 13, 14, 24-25 & Ex 3.) Rhodes heard someone outside say, "He's running." (Id. at 13.) Then, the front door flew open, and the officers entered with guns drawn. (Id. at 9, 14.) Rhodes, who was not armed, asked, "What the hell are you all doing in here?" (Id. at 9, 17.) Someone responded, "Well I'm the law," and told Rhodes that they had a search warrant. (Id.) Someone said they were going to handcuff Rhodes. (Id. at 10, 18.) Defendant Narcotics Agent Clemmons, who was wearing a mask, to whom Rhodes is related, and who Rhodes identified by his voice, told Rhodes to "get in the floor." (Id. at 10-11, 18, 29.) Rhodes told him that he (Rhodes) could not get on the floor because he has bad legs and his shoulder and back had been broken. (Id. at 10, 18.) Agent Clemmons ordered Rhodes again to get on the floor. (Id.) Rhodes responded, "I'll try to." (Id.) Rhodes got his right knee and hand on the floor, when Agent Clemmons kicked him in the back and shoulder and caught his hand and twisted his shoulder. (Id. at 10, 19, 27, 29.) Rhodes's hands were then placed in front

with plastic zip cuffs, and he was brought up on his feet. (Id. at 30-31.) As a result of the force used, Rhodes's previously surgically implanted anchors in his shoulder were ripped out and he suffered a torn rotator cuff and broken bone in his hand. (Verified Compl., DE # 1-2, ¶ 37.)

According to defendants, a member of the SWAT team knocked loudly on Holland's residence and shouted several times, "Sheriff's Office! Search warrant!" (Holman Aff., DE # 54-7, ¶ 7; Cherry Aff., DE # 54-8, ¶ 8; Lentz Aff., DE # 54-9, ¶ 7.) No one responded. (Id.) As the SWAT team entered the house, members yelled, "Sheriff!" and commanded, "Show your hands!" and "Get down on the floor!" (Holman Aff., DE # 54-7, ¶ 9; Cherry Aff., DE # 54-8, ¶ 10; Lentz Aff., DE # 54-9, ¶ 9.) Rhodes ignored the commands and went into the bedroom. (Cherry Aff., DE # 54-8, ¶ 10; Lentz Aff., DE # 54-9, ¶ 10.) The officers commanded Rhodes to come out of the bedroom, show his hands, and get down on the floor. (Cherry Aff., DE # 54-8, ¶ 12; Lentz Aff., DE # 54-9, ¶ 11.) By this time, the officers were in the kitchen. (Cherry Aff., DE # 54-8, ¶ 11.) Rhodes came out of the bedroom and advanced towards the officers, while they continued to command him to show them his hands and get on the floor, which Rhodes continued to ignore. (Cherry Aff., DE # 54-8, ¶ 13; Lentz Aff., DE # 54-9, ¶ 11.) One officer "attempted to stun [Rhodes] by employing a trained stun technique to his brachial plexus with the outside edge of [the officer's] hand." (Cherry Aff., DE # 54-8, ¶ 13.) That effort was not successful. (Id.) Another unidentified SWAT team member wrestled Rhodes to the floor and secured his hands with plastic zip-tie cuffs. (Cherry Aff., DE # 54-8, ¶ 14; Lentz Aff., DE # 54-9, ¶ 12.) Other than the attempt to stun Rhodes, no one struck him at any time. (Cherry Aff., DE # 54-8, ¶ 14.)

Defendants maintain that Agent Clemmons did not enter Holland's house with the SWAT team. (Holman Aff., DE # 54-7, ¶ 13; Cherry Aff., DE # 54-8, ¶ 18; Lentz Aff., DE # 54-9, ¶

8

15.)  Rather, Agent Clemmons was sitting outside Holland's residence in the car of Agent Jeff Beck while the SWAT team secured the premises.  (Clemmons Aff., DE # 54-6, ¶ 7; Beck Aff., DE # 54-10, ¶ 7.)  Agent Clemmons, who was wearing civilian clothes and nothing covering his face, entered the house with Agent Beck to assist with the search.  (Clemmons Aff., DE # 54-6, ¶¶ 5, 7; Beck Aff., DE # 54-10,  ¶ 7.)   He never saw, spoke to, or touched Rhodes.  (Clemmons Aff., DE # 54-6, ¶¶ 8, 11; see also Cherry Aff., DE # 54-8, ¶ 18; Lentz Aff., DE # 54-9, ¶ 15.)

Based on the foregoing, it is hotly contested whether any excessive force was used on Rhodes and, if there was, whether Agent Clemmons was the person who inflicted that force. When the facts are viewed in the light most favorable to plaintiffs, those facts show that Agent Clemmons violated Rhodes's Fourth Amendment right to be free from the use of excessive force in the course of Rhodes's seizure.  As noted, Rhodes was unarmed.  He told the officers why he could not get down on the floor.  In response to the continued command to get down on the floor, he attempted to do so, but before he could fully comply, Agent Clemmons kicked him in the back and shoulder and wrenched his arm.  Rhodes posed no immediate threat to officer safety nor did he actively resist arrest or attempt to flee.  Based on this version of the facts, a reasonable juror could conclude that Agent Clemmons's actions were not objectively reasonable and that he violated Rhodes's Fourth Amendment right to be free from excessive force in the course of a seizure.

Continuing the qualified immunity analysis, the court next examines whether that right was clearly established on 12 February 2013.  The court has no difficulty concluding that it was. It has long been recognized that an officer cannot use "unnecessary, gratuitous, and disproportionate force" to subdue an unarmed subject who poses no threat to the officer's safety. See Meyers v. Baltimore Cty., Md., 713 F.3d 723, 734-35 (4th Cir. 2013).   A reasonable person

in Agent Clemmons's position would have known that his conduct was unconstitutional.

Accordingly, he is not entitled to summary judgment on the ground of qualified immunity.

### ii. Unreasonable Search and Seizure Claim

Plaintiffs assert two distinct theories of liability for their claim of violation of their Fourth Amendment right to be free from unreasonable search and seizure. First, plaintiffs claim that Detective Edwards exceeded the scope of the search warrant for Holland's residence.[2] [3] (Pls.' Mem., DE # 61, at 19.)

> "If the scope of the search exceeds that permitted by the terms of a validly issued warrant or the character of the relevant exception from the warrant requirement, the subsequent seizure is unconstitutional without more." *Horton v. California*, 496 U.S. 128, 140, 110 S. Ct. 2301, 110 L. Ed. 2d 112 (1990). However, even when a constitutional violation is found, qualified immunity may still attach if a reasonable officer would not have realized that he was exceeding the scope of the search warrant. *Saucier v. Katz*, 533 U.S. 194, 202, 121 S. Ct. 2151, 150 L. Ed. 2d 272 (2001). This inquiry "must be undertaken in light of the specific context of the case, not as a broad general proposition." *Id.* at 201, 121 S. Ct. 2151. To put it more concisely "the unlawfulness must be apparent." [*Anderson v. Creighton*, 483 U.S. 635, 640-41, 107 S. Ct. 3034 (1987)].

Ark. Chronicle v. Murphy, 183 F. App'x 300, 311 (4th Cir. 2006).

The search warrant at issue here authorized the seizure of the following items:

1. Power and lawn equipment.
2. Electronic equipment, televisions, cell phones, to include but not limited to computers.[] Additionally, computer software, tapes and discs, audio tapes, and the aforementioned electronic equipment[.]
3. United States Currency, precious metals, jewelry, and financial instruments.
4. Indicia of occupancy, residency, rental and or ownership of the premises described herein, including but not limited to, utility and telephone bills, cancelled envelopes, rental purchase, or lease agreements, and keys[.]
5. Firearms and ammunition, including but not limited to, handguns, pistols, revolvers, rifles, shotguns, machine-guns, and other weapons.

---

[2] For purposes of the motion, plaintiffs concede that the search warrant was validly issued. (Pls.' Mem., DE # 61, at 19.)

[3] Plaintiffs assert this claim against Agent Clemmons too. (See Compl., DE # 1-2, ¶¶ 45, 79-90.) However, plaintiffs' argument only addresses Detective Edwards's conduct or refers generically to "Defendants." Furthermore, it is apparent Agent Clemmons's role in the search was minimal. (See Clemmons Aff., DE # 54-6, ¶ 9.) Therefore, the court restricts its analysis to Detective Edwards's conduct.

6. Property more specifically described on the attached incident reports identified as Exhibit l, Exhibit 2 and Exhibit 3[,] and any other property discovered that is stolen property or evidence of a crime[.]

(Edwards Aff., Ex. A., DE # 54-5, at 16, 18.)  Plaintiffs point out that "Edwards . . . seized dozens of items that were not found on th[e] incident reports" and identify several categories of items which purportedly illustrate the "excessive seizures," (Pls.' Mem., DE # 61, at 20), namely, Walmart gift cards, Gameboy Advance/Nintendo Wii, a generator, and Samsung television/Gateway ZX computer, (id. at 21-23).

It is significant to note that by its plain terms, the search warrant did not limit the seizure of items to those identified in the attached incident reports.  Rather, it identifies several categories of items.  The Walmart gift cards fall within the category of "any other property discovered that is stolen property or evidence of a crime."  Based on the information Detective Edwards had obtained from King, that is, an individual at the residence named "Dave" had paid her cash for Walmart gift cards that she obtained by shoplifting, a reasonable officer in Detective Edwards's position would have been warranted in believing that the gift cards were stolen and could be seized.  That the gift cards were ultimately returned to plaintiffs, suggesting that they were not procured illegally, (Pls.' Mem., DE # 61, at 21), is of no moment.  The officer's conduct is judged from the moment in time as of the seizure, see Rowland v. Perry, 41 F.3d 167, 173 (4th Cir. 1994) ("[T]he immunity inquiry must be filtered through the lens of the officer's perceptions at the time of the incident in question." (citation omitted)), and a reasonable officer in Detective Edwards's position would not have realized she was exceeding the scope of the warrant by seizing the gift cards which fall within a category of items specified in the warrant and about which she had a reasonable belief were obtained illegally.

Turning to the video gaming devices, they fit within the category of "electronic equipment." According to defendants, these items were seized based on the Shallotte Police Department's having received reports that such items had recently been stolen. (Pls.' Ex. K, DE # 61-12, at 17, 18.) Plaintiffs take issue with the fact that defendants did not produce the reports to substantiate this sworn statement and argue that the items' identifying characteristics, such as serial numbers, could have been compared to those characteristics contained in any prior reports of stolen property. (Pls.' Mem., DE # 61, at 22.) It is enough that defendants have attested to the statement. Further, that the officers could have executed the search differently (or even better) does not necessarily make their conduct unreasonable. A reasonable officer in Detective Edwards's position, possessing the information that Gameboy Advance(s) and Nintendo Wii(s) had recently been stolen in the area and possessing a warrant authorizing the seizure of electronic equipment, would not have realized that she was exceeding the scope of the search warrant.

Plaintiffs also take issue with the seizure of a generator from Holland's residence. The generator falls within the category of "power equipment" on the search warrant. Plaintiffs question defendants' stated reason for the seizure: "it appeared to match the description of two generators reported to have been stolen," (Pls.' Ex. K, DE # 61-12, at 23). Specifically, plaintiffs point out that one generator that was reported stolen from William Schmidt was actually recovered at a pawn shop 12 days prior to the search of Holland's residence. (Pls.' Mem., DE # 61, at 22.) They also cite defendants' failure to provide a report or other information about the other generator stolen. (Id.) Unlike for a number of other items seized, (see, e.g., Pls.' Ex. K., DE # 61-12, at 16, 17, 18), defendants' stated justification for seizure of the generator does not rely on property reported stolen from Schmidt, (id. at 23). Like the video gaming devices, it is enough that the search warrant authorized the seizure of power equipment; Detective Edwards

possessed information that two generators had been stolen; and she acted on the belief that the generator at issue appeared to match the description of the generators previously reported stolen. A reasonable officer in her position would not have realized her conduct in seizing the generator was unlawful.

Finally, plaintiffs contend that the seizure of a Samsung television and a Gateway computer was unconstitutional. The search warrant specifically authorized the seizure of televisions and computers. Defendants state that the particular television and computer were seized because the item was either in close proximity to, or in a room containing, other items which were believed to be stolen. (Id. at 18.) Also, the manner in which these electronic items were stored led the officers to believe they may have been stolen. (Id.) Plaintiffs cast doubt on defendants' justification for the seizure, noting defendants' failure to specifically describe the manner in which the items were stored or explain why the manner is indicative of stolen property. (Pls.' Mem., DE # 61, at 22-23.) They also suggest that under defendants' rationale, all of Holland's property could have been seized because of the proximity of supposedly stolen items to one and other. (See id. at 23.) The court disagrees. Rather, with a warrant in hand authorizing the seizure of televisions and computers and finding those items close to, and stored like, other items believed to have been stolen, a reasonable officer in Detective Edward's position would not realize her conduct was unlawful.

In sum, to the extent plaintiffs claim that Detective Edwards exceeded the scope of the search warrant, Detective Edwards is entitled to qualified immunity, and the entry of summary judgment on this claim is appropriate.

Plaintiffs' other theory of liability for the unreasonable search and seizure claim is based upon defendants' allegedly exceeding the scope of Rhodes's consent to search his residence.

13

(Pls.' Mem., DE # 61, at 19.)  "A suspect's consent to search provides an exception to the Fourth Amendment's warrant and probable cause requirements.  Once a [suspect] voluntarily gives consent, a search that falls within the scope of that consent is constitutionally permissible."  United States v. Ortiz, 669 F.3d 439, 445 (4th Cir. 2012) (citations omitted).  "[T]he giver of consent . . . controls the scope of consent.  It is perfectly within a homeowner's rights to give a limited consent to search.  As the Supreme Court has stated, an individual 'may of course delimit as he chooses the scope of the search to which he consents.'"  United States v. Coleman, 588 F.3d 816, 820 (4th Cir. 2009) (quoting Florida v. Jimeno, 500 U.S. 248, 252 (1991)).

Neither side devotes much discussion to this aspect of plaintiffs' search and seizure claim.  The facts that they each emphasize leads the court to conclude that a genuine issue of material fact exists.  Defendants rely on Rhodes's consent to search his residence.  According to defendants, Rhodes gave Detective Edwards and other officers verbal and written permission "to search his property at 1241 David L Street to retrieve items" he had bought from Priest.  (Edwards Aff., DE # 54-5, ¶ 19.)  Edwards states, "The Consent to Search form was read aloud to Mr. Rhodes before he signed it."  (Id. ¶ 20.)  The signed form, which appears to bear a signature of David L. Rhodes, permits a "complete search" of the property located at 1241 David L Street, Supply, North Carolina, and authorizes officers to remove from the property any stolen property and "any other materials of evidence of any crime which they may desire," among other things.  (Id., Ex. D.)  While plaintiffs do not appear to dispute that the consent form was read to Rhodes and that he signed it, (see Pls.' Mem., DE # 61, at 10 ("[A] general consent to search was provided and read to [Rhodes].  Again, Plaintiff Rhodes was unable to read this document but agreed to sign it." (citations omitted))), they maintain that Rhodes limited his consent.  Rhodes testified,

I said I'll make a deal with you all now. I said, I'll take you all to get—get that stuff at my other place. Where is that other place, they said? I said, ya'll [sic] promise me, we'll go to that one shed and I'll give it to you when we get there. And don't mess with my young'uns over there. Said yes, sir.

(Rhodes Dep., DE # 54-12, at 32.) He testified further, "I said ya'll [sic] promise you'll just go to one building I got. I'll take you to it and you—I'll give you these—these four items, and you back out and leave." (Id. at 46.)

Viewing the facts in the light most favorable to Rhodes, despite his written consent to search his all property, he limited that consent to a search of one shed. When Edwards searched beyond the confines of that shed, (see id. at 48 (Rhodes testifying that officers went in his garage, house, and another shed)), she exceeded the scope of the limited consent given, thereby violating Rhodes's Fourth Amendment right to be free from an unreasonable search.[4] Furthermore, any reasonable officer would have known in 2013 that it would have been unlawful for her to search outside of the one portion of the property to which consent was limited. Accordingly, Detective Edwards is not entitled to summary judgment on the ground of qualified immunity on this claim.

### iii. Claims Against Sheriff Ingram

Plaintiffs assert their § 1983 claims not only against the individual officers involved, Detective Edwards and Agent Clemmons, but also against John Ingram in his official capacity as the Brunswick County Sheriff. A claim against a governmental officer in his official capacity is deemed a claim against the governmental entity itself. Andrews v. Daw, 201 F.3d 521, 525 (4th Cir. 2000).

Although a local government entity may be held liable under § 1983, it is well settled that a local government entity cannot be held liable under § 1983 on a respondeat superior theory. Rather, to establish liability of the entity, a plaintiff

---

[4] While this claim is also asserted against Agent Clemmons, there is no evidence that he was involved in the search of Rhodes's property.

must show that: (1) a government actor deprived the plaintiff of her
federal rights; and (2) the harm was the result of municipal policy or
custom. "This requirement limits municipal liability under section 1983 to
those actions for which the municipality is actually responsible by
distinguishing between acts attributable to the municipality and acts
attributable only to municipal employees." . . . .

     A policy or custom for which a local government entity may be held liable
may arise in four ways:

     (1) through an express policy, such as written ordinance or
regulation; (2) through the decisions of a person with final
policymaking authority; (3) through an omission, such as a failure
to properly train officers, that "manifest[s] deliberate indifference
to the rights of citizens"; or (4) through a practice that is so
"persistent and widespread" as to constitute a "custom or usage
with the force of law."

. . . .

Johnson v. City of Fayetteville, No. 5:12-CV-456-F, 2015 WL 928772, at *24-25 (E.D.N.C.

Mar. 4, 2015) (citations omitted).

     In support of their governmental liability claim, plaintiffs point to two alleged violations

of the Sheriff's policies.  First, plaintiffs claim the violation of the Sheriff's use of force policy

by the failure to conduct an investigation into the use of force against Rhodes.  (Pls.' Mem., DE

# 61, at 24; see also Pls.' Ex. O., DE # 61-16 (use of force policy).)  Second, they claim a

violation of the Sheriff's policy on searches by the failure to complete documentation required

by that policy.  (Pls.' Mem., DE # 61, at 24-25; see also Pls.' Ex. P, DE # 61-17 (search and

seizure policy).)  Even assuming that violations of these policies occurred, "municipal liability

will attach only for those policies or customs having a '*specific* deficiency or deficiencies . . .

such as to make the *specific* violation almost bound to happen, sooner or later, rather than merely

likely to happen in the long run,'"  Carter v. Morris, 164 F.3d 215, 218 (4th Cir. 1999) (citation

omitted) (emphases in original).  Plaintiffs do not rely on a particular deficiency with the

Sheriff's policies nor can they show that the violations of the policies resulted in the violations of

their Fourth Amendment rights.  The purported policy violations occurred after the alleged

constitutional violations. Under these circumstances, the violations of the Sheriff's policies cannot form a basis for the Sheriff's liability in his official capacity. Cf. Salvato v. Miley, 790 F.3d 1286, 1295-96 (11th Cir. 2015) (holding that the sheriff was entitled to judgment as a matter of law on excessive force claim based on the sheriff's failure to investigate subject incident of excessive force because the plaintiff could not show evidence of a policy approved by the sheriff that led to the use of excessive force or show that he reviewed the officer's decision to engage in the conduct and approved it *beforehand*).

Plaintiffs also appear to rely on a failure-to-train theory in support of their § 1983 claim against the Sheriff. (See Pls.' Mem., DE # 61, at 25-26.) Official capacity liability under § 1983 may be premised on a failure to train. However,

> [a] municipality's failure to train its officers can result in liability under section 1983 only when such failure reflects "deliberate indifference" to the rights of its citizens. That is, "[o]nly where a failure to train reflects a 'deliberate' or 'conscious' choice by a municipality—a 'policy' as defined by our prior cases— can a city be liable for such failure under § 1983."

Doe v. Broderick, 225 F.3d 440, 456 (4th Cir. 2000) (citations omitted). Plaintiffs simply assume that because the Sheriff's policies discussed above were (allegedly) violated, the officers involved in the constitutional deprivations were not adequately trained and/or supervised. Plaintiffs have come forward with no evidence regarding the lack of training. Also, even accepting that there was a deficiency in training, that failure to train as to the policies supposedly violated did not cause the constitutional deprivations. See Brown v. Mitchell, 308 F. Supp. 2d 682, 701 (E.D. Va. 2004) ("To impose [§ 1983] liability on a supervisor for the failure to train subordinates, a plaintiff must plead and prove that: . . . this failure to train actually caused the subordinates to violate the plaintiff's rights." (citations omitted)).

Because plaintiffs cannot show any ground upon which to impose liability on Sheriff Ingram in his official capacity, defendants are entitled to summary judgment on the § 1983 claim against him.[5]

## B. State Law Claims

### i. False Imprisonment Claim

Rhodes alleges a claim for false imprisonment. "'False imprisonment' has been defined as 'the illegal restraint of a person against his will.' A restraint is illegal if it is unlawful or not consented to." Moore v. Evans, 476 S.E.2d 415, 421 (N.C. Ct. App. 1996) (citations omitted).

> An officer executing a warrant directing a search of premises not generally open to the public or of a vehicle other than a common carrier may detain any person present for such time as is reasonably necessary to execute the warrant.

> N.C. Gen. Stat. § 15A-256 (2007). "In executing a search warrant officers may take reasonable action to secure the premises and to ensure their own safety and the efficacy of the search." L.A. Cty. v. Rettele, 550 U.S. 609, 614, 167 L. Ed. 2d 974, 979 (2007). "Such detentions are appropriate . . . because the character of the additional intrusion caused by detention is slight and because the justifications for detention are substantial." Muehler v. Mena, 544 U.S. 93, 98, 161 L. Ed. 2d 299, 306 (2005). The detention of an occupant is less intrusive than the search itself, and the presence of a warrant ensures that a neutral magistrate has determined that probable cause exists to search the home. Id. In contrast to this incremental intrusion, law enforcement has substantial justification for detaining an occupant:
>> "preventing flight in the event that incriminating evidence is found"; [sic] "minimizing the risk of harm to the officers"; [sic] and facilitating "the orderly completion of the search," as detainees' "self-interest may induce them to open locked doors or locked containers to avoid the use of force."
> Id. at 96, 161 L. Ed. 2d at 306-07 (quoting Michigan v. Summers, 452 U.S. 692, 702-03, 69 L. Ed. 2d 340, 349-50 (1981)).

> . . . . Furthermore, the "safety risk inherent in executing a search warrant for weapons [is] sufficient to justify the use of handcuffs[.]" Muehler, 544 U.S. at 100, 161 L. Ed. 2d at 308.

---

[5] This same analysis applies to the extent plaintiffs assert their § 1983 claims against Detective Edwards and Agent Clemmons in their official capacities.

Jackson v. Daniels, No. COA08-822, 2009 WL 1054002, at *6 (N.C. Ct. App. Apr. 21, 2009) (alterations in original).

Here, the officers were executing a facially valid search warrant. Under North Carolina law, they were authorized to detain Rhodes for a reasonable amount of time to execute the search. Their use of handcuffs to detain Rhodes was not unreasonable given the information that they possessed about stolen firearms being present in the residence. Also, Rhodes agreed to accompany officers to his property. (Edwards Aff., DE # 54-5, ¶ 19; see also Rhodes Dep., DE # 54-12, at 46.) The entire episode lasted approximately three hours. (See Edwards Aff., Ex. A, DE # 54-5 (search warrant executed at 10:23 p.m.); Rhodes Dep., DE # 54-12, at 52, 54 (officers turned Rhodes "loose" around 1:00 a.m.).) Under these circumstances, the officers' restraint of Rhodes was lawful and, in part, consented to. Accordingly, defendants are entitled to summary judgment on Rhodes's false imprisonment claim. See Unus v. Kane, 565 F.3d 103, 119-21 (4th Cir. 2009) (applying Virginia law and upholding summary judgment entered against the plaintiffs on their false imprisonment and battery claims, where federal agents had detained the plaintiffs in handcuffs for nearly four hours while executing warrant to search for evidence related to money laundering in support of international terrorism); Jackson, 2009 WL 1054002, at *5-7 (affirming entry of summary judgment against the plaintiff on her false imprisonment, assault, and battery claims based on the execution of a search warrant for weapons and controlled substances where the plaintiff was handcuffed).

*ii. Emotional Distress Claims*

Holland asserts claims for intentional infliction of emotional distress and negligent infliction of emotional distress. With regard to these claims, Holland relies exclusively on Detective Edwards's exceeding the scope of the search warrant, threatening to auction Holland's

property, and falsely accusing Holland of various crimes.[6]  (See Pls.' Mem., DE # 61, at 28, 29,

30.)

> The essential elements of a claim for [intentional infliction of
> emotional distress] are "(1) extreme and outrageous conduct, (2) which is
> intended to cause and does cause (3) severe emotional distress to another."
> The liability clearly does not extend to mere insults,
> indignities, threats, annoyances, petty oppressions, or other
> trivialities.  The rough edges of our society are still in need
> of a good deal of filing down, and in the meantime
> plaintiffs must necessarily be expected and required to be
> hardened to a certain amount of rough language, and to
> occasional acts that are definitely inconsiderate and unkind.
> There is no occasion for the law to intervene in every case
> where someone's feelings are hurt.  There must still be
> freedom to express an unflattering opinion . . . .
> "'Conduct is extreme and outrageous when it is so outrageous in character, and
> so extreme in degree, as to go beyond all possible bounds of decency, and to be
> regarded as atrocious, and utterly intolerable in a civilized community.'"  "The
> determination whether conduct rises to the level of extreme and outrageous
> behavior is a question of law."

Chidnese v. Chidnese, 708 S.E.2d 725, 738 (N.C. Ct. App. 2011) (citations omitted).  North

Carolina courts "'ha[ve] set a high threshold for a finding that conduct meets the standard' of

extreme and outrageous conduct."  Id. (citation omitted).

Edwards's conduct does not meet this standard.  First, with regard to Detective

Edwards's search of Holland's residence and as recognized previously, a reasonable officer in

Detective Edwards's position would not have realized she was exceeding the scope of the

warrant.  Second, while Detective Edwards may have accused Holland of breaking into people's

houses and safes and hiding Rhodes's car because it was stolen, (see Holland Dep., DE # 54-15,

at 32), as well as threatened to auction Holland's seized property, (id. at 44), and while her

statements may have been unnecessary, hurtful, rude, and even untrue, that conduct simply does

---

[6] Although Holland asserts her emotional distress claims against Agent Clemmons too, (see Compl., DE # 1-2, ¶¶
99-104, 106-13), there is no evidence that Agent Clemmons engaged in the conduct of which Holland complains,
and her argument against summary judgment on these claims does not suggest otherwise.

not exceed all possible bounds of decency tolerated by society. Therefore, Holland cannot satisfy this essential element of her claim, and defendants are entitled to summary judgment on Holland's intentional infliction of emotional distress claim.

Turning to Holland's claim for negligent infliction of emotional distress, defendants contend that the officers are entitled to public official immunity.

> Under North Carolina law, police officers are public officials who may be entitled to public official immunity. *See, e.g., Prior v. Pruett*, 143 N.C. App. 612, 623, 550 S.E.2d 166, 173–74 (2001); *Schlossberg v. Goins*, 141 N.C. App. 436, 445, 540 S.E.2d 49, 56 (2000). Under North Carolina law, a "[p]ublic official [ ] cannot be held individually liable for damages caused by mere negligence in the performance of [his] governmental or discretionary duties," unless his conduct "was corrupt or malicious, or . . . outside of and beyond the scope of his duties." *Meyer v. Walls*, 347 N.C. 97, 112, 489 S.E.2d 880, 888 (1997); *Smith v. State*, 289 N.C. 303, 331, 222 S.E.2d 412, 430 (1976); *Prior*, 143 N.C. App. at 623, 550 S.E.2d at 173–74. A public officer "acts with malice when he wantonly does that which a man of reasonable intelligence would know to be contrary to his duty and which he intends to be prejudicial or injurious to another." *Grad v. Kaasa*, 312 N.C. 310, 313, 321 S.E.2d 888, 890 (1984). The act must be "done of wicked purpose, or . . . done needlessly, manifesting a reckless indifference to the rights of others." *Id.* at 313, 321 S.E.2d at 891 (quotation omitted).

Smith v. Garcia, No. 5:08-CV-577-D, 2010 WL 3361653, at *3 (E.D.N.C. Aug. 20, 2010) (alterations in original). "Malice and corruption are difficult to show because 'it is presumed that a public official in the performance of his official duties acts fairly, impartially, and in good faith and in the exercise of sound judgment or discretion, for the purpose of promoting the public good and protecting the public interest.'" Id. at *4 (quoting In re Annexation Ordinance No. 300–X, 284 S.E.2d 470, 472 (N.C. 1981)).

Plaintiffs have not come forward with evidence to show that Detective Edwards acted with malice or corruption or beyond the scope of her duties in regards to her participation in the search of Holland's residence or her accusatory and threatening statements to Holland. Detective Edwards possessed information from King to indicate that there was stolen property within

Holland's residence; she was executing a facially valid search warrant; and, Holland had admitted to Detective Edwards that she (Holland) had purchased a television from King, Priest, and Vernon, which Detective Edwards knew to have been stolen. At best, Detective Edwards may have been negligent, but negligent conduct is not enough to overcome the presumption that she acted in good faith and in the exercise of sound judgment. Therefore, defendants are entitled to summary judgment on Holland's negligent infliction of emotional distress claim.

### iii. Claims Against Sheriff Ingram

Plaintiffs have also alleged their state law claims against Sheriff Ingram in his official capacity. Because the court has concluded that none of plaintiffs' state law claims survive, there is no basis upon which to hold Sheriff Ingram.

### iv. Defamation Claim

Agent Clemmons asserts a counterclaim for defamation *per se* against Rhodes. According to several of Agent Clemmons's relatives, Rhodes told them that Agent Clemmons had in engaged in police brutality against him. (J. Clemmons Aff., DE # 57-3, ¶ 4; Gay Aff., DE # 57-4, ¶4; Lovett Aff., DE # 57-5, ¶4.) Rhodes acknowledges that he told another law enforcement officer, Ashley Long, as well as Agent Clemmons's aunts that Agent Clemmons had used force against him. (See Rhodes Dep., DE # 54-12, at 99-101.) Agent Clemmons's argument in support of summary judgment is based on his version of the facts--that he did not use any force whatsoever on Rhodes--and therefore, Rhodes's statements to the contrary are false. As discussed previously in conjunction with Rhodes's excessive force claim, it is disputed whether Agent Clemmons used force against Rhodes. Accordingly, Agent Clemmons's motion for summary judgment will be denied.

**C.  Liability on the Bond**

Because it is not clear whether plaintiffs contend that their federal claims are covered by the Sheriff's bond issued by defendant Western Surety Company, the court will not dismiss the company.

## III. CONCLUSION

For the foregoing reasons, defendants' motion for summary judgment is GRANTED IN PART and DENIED IN PART.  Defendant Timothy Clemmons's motion for summary judgment on his counterclaim is DENIED.  Defendant John Ingram is DISMISSED.  All of Holland's claims are DISMISSED.  Rhodes's § 1983 claim based on the search of Holland's residence and false imprisonment claim are DISMISSED.  Rhodes's § 1983 claims based on excessive force and exceeding the scope of consent to search and Clemmons's counterclaim remain.

This 25 August 2015.

_____
W. Earl Britt
Senior U.S. District Judge